and I was assigned in this case to represent Mr. Mann in this appeal. With the court's permission, argument today will be presented by Adam Orser-Briggen, a third-year law student at Georgetown who is appearing with consent of the client and in conformity with the rules of this court. Thank you. We'll be glad to hear from you. Thank you, Your Honors. May it please the court. This appeal presents several claims of excessive force. Three claims involve the use of physical force, and two claims involve the denial of decontamination from chemical munitions. I'd like to begin with the August 23rd denial of decontamination claim, which the magistrate judge recommended be set for trial because it fits squarely within this court's decision in Williams. Now, the defendants do not address Williams in their brief and do not attempt to distinguish Williams in any way. Now, in Williams, this court was faced with an inmate who was restrained for eight hours after being sprayed with chemical munitions, in that case, mace. And this court held that summary judgment was improper, at least with regards to the subjective component of the excessive force test, where there was nothing in the summary judgment record to indicate that that inmate was doing anything while in the restraints that would have justified decontamination or the denial of decontamination, I'm sorry. Now, Mr. Mann raises a very similar allegation here. Mr. Mann alleges that he was sprayed with a large amount of chemical munitions, in this case, pepper spray, from two separate canisters from an MK-9 Fogger. And Mr. Mann alleges that he was subsequently restrained in a restraint chair for six hours, during which time he pleaded for decontamination. And, Your Honors, this is on page 652 and 653 of the Joint Appendix. That's Mr. Mann's affidavit. And what Mr. Mann clearly alleges is that he pleaded with the officers and the nurses who were present for decontamination. Mr. Mann alleges that one of those officers, Captain Wilson, told him that he would be lucky if he ever got to decontaminate after what he had done, referring to Mr. Mann's throwing of feces during the August 23rd cell extraction incident, which I can address separately. That's a separate claim of excessive force that Mr. Mann raises here. But the allegations that are made in Mr. Mann's affidavit, here on page 652 and 653, show evidence of malice that meets this Court's standard for the subjective component of an excessive force claim. So unless Your Honors have questions on that claim, I can turn to the physical force claims. I'll begin with the August 23rd cell extraction incident. Now, we're not unmindful that cell extractions generally are very dangerous situations and that they, of course, necessitate the use... I'm sorry, Counsel. How exactly did the District Court err on the decontamination claim? The District Court, Your Honor, distinguished this Court's decision in Williams and ruled on the basis of the subjective component that there was no excessive force claim. So, Your Honor, we are addressing just the subjective component here in claiming that Mr. Mann provided sufficient evidence of malice to make out that component. Do you think the District Court overlooked the affidavit? Your Honor, I think they did. I think what the District Court did is essentially to overlook evidence with regards to a number of these claims. With regards to... Did the Magistrate Judge highlight that particular portion of the affidavit for the District Court? Which... This affidavit, certainly, Your Honor, but which... Are you referring to a specific portion? I'm referring to the portion that you rely on here in your argument at 652 of the joint appendix. As to Captain Wilson's statement, Your Honor, I think... I don't... I'm not sure that the Magistrate Judge specifically referenced that. I can go back and check. No, that's okay. But unless there are other questions on the decontamination claim, I can turn to the physical force claims. As I was saying, Your Honor, we're not unmindful of the fact that cell extraction... The physical force claim for August 23rd? Yes, Your Honor, relating to the cell extraction incident that occurred. Now, again, cell extraction incidents will require some use of force, certainly. But what Mr. Mann alleges occurred here, and Mr. Mann's verified complaint discusses this at page 30 of the joint appendix. That's Mr. Mann's complaint. Mr. Mann alleges, very specifically, that after he was thrown to the floor and placed in restraints without resistance or assault, that the officers slammed his face into concrete floor repeatedly and continuously punched, kneed, kicked, and elbowed plaintiffs all over his fully restrained body. Now, Mr. Mann further alleges evidence of malice on the part of Officer Manganielli, who he claimed in his complaint poured a bottle of feces onto his head and rubbed it into his face, and this is evidence of malice for the purposes of this claim. Now, notably, a videotape was made of the August 23rd cell extraction incident that could either corroborate or refute Mr. Mann's claims in this regard. But that videotape was never produced below. According to the defendants, that videotape malfunctioned. According to Mr. Mann and two other inmates who filed an affidavit, these affidavits are located on page 627 of the Joint Appendix and page 629 of the Joint Appendix. These are two inmates who alleged overhearing a conversation between one of the defendant officers and Mr. Mann stating that the videotape of the cell extraction would be destroyed if Mr. Mann's claims ever got to court. And this is additional powerful evidence of malice on the part of the officers. A reasonable inference could be drawn from the absence of that videotape to show that the officers who extracted Mr. Mann from the cell on that day destroyed that tape to conceal the force that Mr. Mann clearly alleged in his verified complaint was used on him that day. Was a standard procedure to make a video of these things? Your Honor, it's not entirely clear from the record that it is a standard procedure. There is a grievance that Mr. Mann filed requesting documentation of his injuries from that day in which, and I'll quote from that grievance. This is located on page, give me one moment to find it, Your Honors. This is on page 57 of the Joint Appendix. This is the warden's response to Mr. Mann's grievance requesting documentation. The warden writes, however, as you already know, the standard video recording attempt did not take place as a result of the technological failure at that time. He used the word standard. Yes, Your Honor. So I think that reasonably suggests that a videotape is always made in these kind of incidents. But, of course, that's not entirely clear. But, Your Honor, that videotape is very, very powerful evidence that could either refute or support Mr. Mann's claims. Now, the defendant's claim, in quote Scott versus Harris, that Mr. Mann's claims simply could not be believed by a reasonable jury. And for that purpose, we must discard the ordinary summary judgment standard review and simply not credit Mr. Mann's account. Now, that videotape may have been able to do that, but the medical reports that the defendant's cite and the subjective claims made in incident reports that the defendant's cite cannot. And that, I think, shows that what we're left with here on summary judgment are Mr. Mann's very clear allegations with regards to what occurred during the cell extraction and what occurred with regards to decontamination. Now, there are several other claims, Your Honor, that I can address briefly. Excuse me, Your Honor. And those claims arise out of a very hostile relationship that Mr. Mann had with one of the guards in this case, Lieutenant Faley. Those incidents occurred on June 14th, June 9th, and July 28th. How about we talk about the June 14th incident and how you get past the standard on it? Sure, Your Honor. On June 14th, what occurred was that Mr. Mann was being escorted from the medical unit back to his cell. And Mr. Mann had been on a five-day hunger strike during that period. Now, Mr. Mann claimed in his affidavit, and this is supported by another affidavit. I'll give you the cite to that. This is inmate Jack Cooper's affidavit on page 544 of the joint appendix, that Mr. Mann basically collapsed. He went to his knees because he was feeling dizzy as a result of the hunger strike. At that point, the officer who was escorting Mr. Mann called out to Lieutenant Faley for assistance. Lieutenant Faley came over, and according to both Mr. Mann and this inmate who filed an affidavit, grabbed Mr. Mann by the crotch chain that runs through his legs, grabbed that along with his arm, and drug him a 25 to 30-yard distance back to the medical unit. Immediately before that, according to Mr. Mann, she said, there ain't nothing wrong with him. And now Mr. Mann alleges that that dragging constitutes excessive force. Her statement certainly indicates malice, and Mr. Mann also states that the medical policy, and let me give you the citation to this, Mr. Mann says that the SCDC had a policy of providing, of having medical come to Mr. Mann to escort him if he was having a medical problem. And that policy was not followed, and if that is indeed the case, as Mr. Mann alleges, and it's not shown because the defendants did not introduce any of the policies that might refute this, that would be evidence of malicious intent on the part of officers if the policy was not followed. That allegation is on page 546 of the joint appendix. Toward the bottom, Mr. Mann writes in his affidavit, referring to Lieutenant Faley, she drug me to medical without regard for any condition that it would have caused me, or my current condition, instead of following proper procedure and calling medical to come to me, especially when the nurses were right down the hall. Now the defendants do not dispute in any way Mr. Mann's claim here that the proper policy was to call for medical for assistance. So as to this claim, Mr. Mann's allegation is that Lieutenant Faley, with whom he had a very hostile relationship, and we provided evidence generally of that ongoing relationship between them throughout that summer, that that was based not on a need to escort him to medical, but based on the malice that she harbored toward him. Are you saying that any force was excessive? No, Your Honor, no. What we're saying is the fact that she grabbed him by the crotch chain, a fact that would certainly cause pain. According to inmate Cooper, the fact that Mr. Mann was in pain was very obvious. He used the words very obvious because the chain was snatched between his legs and she drug him 25 to 30 yards, according to Mr. Mann and inmate Cooper. The fact that she might have picked him up, maybe by the arm, would have been fine. Now Mr. Mann and inmate Cooper both described that another officer attempted to help by grabbing his other arm to support him. And the fact that the other officer might have recognized that Lieutenant Faley's dragging of him was causing him pain would be additional evidence that Officer Beckett realized that Lieutenant Faley was not trying to temper the force applied, as one of the Whitley factors requires. Unless there are other questions about June 14th, I can very briefly talk about what occurred on July 28th. In that incident, Mr. Mann concedes that he did kick Lieutenant Faley that day, immediately after she had improperly applied the leg irons in a way that pinched his back and caused him pain. Now Mr. Mann kicked Lieutenant Faley but afterward was immediately taken to the ground by four male officers who each had control of one limb. Now Mr. Mann's claims are supported by I think four separate affidavits and these are located on pages 571 through 575 of the joint appendix. All of these inmates describe seeing Lieutenant Faley react after the kick by running up the stairs around the crowd of officers who were holding each of Mr. Mann's limbs and then striking Mr. Mann repeatedly on the head. An officer, according to these affidavits, had to shield Mr. Mann from further blows. Now that is very powerful evidence, we believe, of malice on the part of Lieutenant Faley. Mr. Mann did not bring a claim. None of the other individuals who were holding him down were defendants in this case. Mr. Mann brought a claim against Lieutenant Faley because Lieutenant Faley was the one, according to these affidavits, that struck him repeatedly. Your Honors, I see my time is expiring. Unless there are other questions, I'll save the rest for my rebuttal. Okay, thank you. Let's hear from Ms. Holmes. May it please the Court, I am Janet Brooks Holmes and I am here on behalf of the defendants in the case brought by Anthony Mann before the South Carolina Federal District Court. This case represents the worst inmate behavior in the prison context that anyone can imagine. The case is a unique case. In fact, it is a case where the Honorable Federal District Court Judge, Richard Gergel, granted summary judgment in full, dismissing plaintiff, inmate, Mann's entire case. Of all the South Carolina Federal District Court judges, Judge Gergel has a reputation for carefully guarding the rights of inmates and human rights. So the others don't do as good a job. Judge Gergel is very meticulous on this issue and this inmate's behavior was too much even for Judge Gergel. How do you get around the facts here if you view them in the light most favorable to Mr. Mann? Viewing the facts in the light most favorable to the plaintiff, how does the State get around them? In the context of what this appeals about. If we accept, Mr. Mann has made many admissions concerning his own conduct. Let's just look at the admissions that Mr. Mann has made. Mr. Mann admits that on, I believe it was the June 28th, I'm sorry, the July 28th incident, he kicked, when he was in upper body restraints but not lower body restraints, he kicked Lieutenant Bailey in the neck and she almost fell over the railings. He admits to that. Mr. Mann admits to throwing bottles of feces, somewhere between 13 and 18 bottles of stored up feces on the extraction team, including the videographer and the cameraman. Mr. Mann admits that he, when left alone in a room in full body restraints, that he was able to get himself out of all the entire set of body restraints while he was left alone. Are these things justifications for why the officers could inflict these injuries on him? Your Honor, with all due respect, I'm not saying that they are justifications. What's the relevance of them? The relevance is Mr. Mann posed a security threat. His own admitted conduct shows how high of a threat he posed. In the context of the incidents themselves, for example, when he's throwing feces, 13 to 18 bottles of stored up feces on the extraction team, of course there's a lot of chaos in the room. Feces is going everywhere. After he also has admitted that he has been hiding up in his upper bunk and he has admitted that he was doing that because he would not come out though he had been asked and in fact ordered to. But his complaint is as to the injuries that were inflicted on him after that had occurred and after he had stopped resisting. Just as Judge Gergel pointed out, when is that defining moment where all of a sudden the correctional officers know, oh, now he's safe? Everything happens so quickly, and Judge Gergel did a very good job of setting forth the law on the issue and pointing out that how do you know if things are flying? How do you know when that defining moment is when, oh, now everything's okay? Is that what the officer's defense is that he was still resisting? Your Honor, taking everything, we don't need to get into a question of fact. Our position is if you look, this is a unique case. This is not the standard case. You look at the admissions made by the plaintiff himself concerning his own conduct. He admits to bragging about kicking a lieutenant family. His admissions are horrific. At what point do they think, okay, he's no longer a threat? He admits he can get out of full body restraints. At what point is he not a security threat? Okay, so when he got himself out of the restraints, what did that cause the officers to do? What injury does he complain about? That happened. That was caused by him getting out of restraints. That specific incident occurred when he was in a room, and he was in full restraints and he was alone in a room. He got out of the restraints. The officers came and found him in restraints. They put the restraints back on him. And then that's when they walked him back to his cell to go up, either up or down a flight of stairs. They had to remove the lower body restraints, but he had the upper body restraints. He saw a lieutenant family. He kicked her in the neck. After he was back in restraints. Upper body, but not lower. At that point, yes, he still had upper body restraints on him. When he kicked her in the neck in that July 28th incident, he had upper body restraints. They had to remove the lower because of the stairwell. When he kicked her, she goes to the railway and almost falls off, almost goes over the. So him getting out of restraints had nothing to do with her getting kicked or what she did to him thereafter. You take the totality of the circumstances, everything he did, his behavior shows that he is a threat. And Whitley v. Albers has held that the court should give deference to the prison official's decisions at the time that the incident is occurring. You look at the totality of the circumstances in this case, this inmate, he can't be trusted. He can get out of restraints. Even when he's in upper body restraints, he was still hurting people. He was a threat to the other correctional officers. He's a threat to the facility. He's a threat to the other inmates. He's posing a threat. At what point in time, everything happens so fast, there's no way that you can say, oh, well, he's all of a sudden subdued, he's not going to do anything else. How do you know? How can the correctional officers know? And that is what Judge Gergel has written in his order. Discerning, I will quote to you from the order itself, discerning the exact moment that this violent and uncontrollable inmate might no longer be resisting is not an easy task, and the officers need to have some leeway in the exercise of force under the circumstances so that they have sufficient control of the inmate to avoid any unnecessary injury. A court should not retrospectively attempt, in the calmness of a federal courthouse years after a volatile incident initiated by a disobedient and violent prisoner, to second guess the exact moment the prisoner was under control and no further use of force was necessary. And he cites Whitley v. Albers in that portion of his opinion, and there's also language in the Hudson case that supports the same rationale. Nobody just walked up to him, walked up to Mr. Mann, even under Mr. Mann's description of the facts, things didn't come in a vacuum. He's being disobedient. Everything happens in a much more chaotic sense. He was being so disobedient he had just been kicked out of it. The August 23 incident that has been brought to your attention by the attorneys for the appellant, Mr. Mann, he had just been at a disciplinary hearing and he had been found to have a partial paperclip in his mouth, and therefore he had been sent back to his cell. When the correctional officers came to the cell and asked him to come out of the cell because they needed to take him somewhere else to meet with some of the officials, he would not come. He refused to leave the cell. The pepper spray was not sprayed in his face. It was sprayed into the cell. Ms. Holmes, it seems to me that a jury is not going to like Mr. Mann at all. If you get my drift. I think the bigger issue, Your Honor, because people have human rights, so we're really not looking at whether or not a jury would like him or not. I think the biggest issue that I'm seeing is that it's just like Judge Gergel found. If you take the facts presented and the admissions that Mr. Mann has made, even in the light most favorable to Mr. Mann, the jury will not find a reliable inference of wantonness and the infliction of pain by the defendants that would state an Eighth Amendment claim and therefore this case should not go to the jury. But there's value in permitting juries to make some of these decisions. Don't you agree? We have a jury system, Your Honor. And it's one of the most valuable aspects of our system, right? And it can be a little costly sometimes. Your Honor, the jury system is a valuable asset in America and the United States. We are fortunate to have that. And just bringing a guy or a gal in and giving them a day in the courtroom before a group appears and they listen to the evidence. And that's what our system is designed to do. Your Honor, it is, unless the claim is frivolous. You don't suggest that this is a frivolous case. I was basically just responding to what you were talking about. You're not here arguing that this is a frivolous case. I am not saying the case is frivolous. But here is what I'm saying, Your Honor, with all due respect. The exercise of force must be viewed in the context of the Eighth Amendment's prohibition against cruel and unusual punishment. The Eighth Amendment prohibits cruel and unusual punishment, but not cruel and unusual conduct. And that language comes from Farmers v. Brennan, the 1994 U.S. Supreme Court case. I'm not saying that there was cruel and unusual conduct here, but that distinction is made in Farmers v. Brennan makes that distinction, which is very interesting. The Whitley v. Albers, which is a 1986 case from the U.S. Supreme Court, basically takes the Eighth Amendment analysis and puts you have to do a subjective analysis and an objective analysis. Within the subjective analysis, and I know that you are familiar with these cases, Look, I don't mean to suggest by somewhat whimsical quip, I suppose it was, that your office shouldn't do exactly what it does in these cases. And we respect, I respect, we obviously respect the work that you and those of you in your office who represent these men and women who do some of the most difficult, challenging, frankly, god-awful jobs that our society provides. But every now and then, I'm sure this happens, it just didn't happen in this case, every now and then I'm sure that in your office, a bunch of you sit around and say, you know what, let's not compile 500 pages of summary judgment records and all that. Let's just tell the district judge, judge, we'll try this case. Give us a day and a half, we'll bring in the officers, we'll try the case, and let's get it over with. As opposed to burdening the magistrate judge and the district judge with tons of medical records and affidavits and handwritten affidavits. Just try the case. Again, I'm not second-guessing anybody here, but every now and then, that's what makes the most sense. Just try the case. Your Honor, that would be fun because that's what, as lawyers, we like to try cases. Exactly. But the law does not allow this case to be tried, Your Honor. Oh, there's no such law in America that says a person can't have a trial. The law in this case. The federal judges are appointed to do, to try cases. Thank you, Your Honor. We also grant a lot of summary judgment motions, but actually they're appointed to try cases. The reason that I stated, I said that the law in this case does not allow this case to go to the jury, and I am meaning regarding this particular case, not in general, Your Honor, so I apologize if I misstated that. No, no apology there. There is, even when you look at the facts that the plaintiff has presented and you take everything in the light most favorable to the plaintiff. We have to do that. In the summary judgment. You have to do it. That's what you have to do, but you don't want to do it yet, I don't think. I'm giving it to him. What he says is true. He threw feces on everybody. As to the August 23rd instance, if you had a trial and he testified as his affidavit says forth, and he was believed totally, completely by the jury, would he win or lose? Your Honor, because his affidavit is full of inconsistencies and you look at the totality of the circumstances, he would lose. I said if he's believed. If every word of his affidavit is believed? If the jury believes he's telling the truth, would he win or lose? That's a jury question, Your Honor. I don't think I can answer that. But the problem is if you take this case and you. . . Your position is you say he's inconsistent, so your position is not believable. Your Honor. Is that right? Your Honor, my position is. . .our position is that. . . I think now you're referencing the. . . once he was put into the restraint chair and the appellate's counsel is applying the case law from Williams v. Benjamin to this situation. And Judge Gergel distinguished Williams v. Benjamin on several grounds. One of the distinguishing factors is that the plaintiff, Mr. Mann, did not complain at all of any kind of burning sensation or any issue regarding effects of mace while he was in that restraint chair, even though he was seen by medical prior to being put in the restraint chair and during the time he was in the restraint chair and immediately after. Additionally, it was pepper spray. Pepper spray was sprayed into his cell to try to get him to come out, but it wasn't sprayed into his face. Also, I think in Williams v. Benjamin, Mr. Williams was actually restrained. And all that's based on what he said? He admits to all of this, Your Honor. And that's all that's based on what he said? I take that back. His affidavit states that he pleaded for a shower or some kind of decontamination while he was in the chair. That is something in his affidavit. But the reality is if you look at what happened in this case, medical saw him before he was put in the chair, during and after. Additionally, after the pepper spray was sprayed into his cell, not in his face but into his cell, he does admit that he was up in the top bunk into the corner. This is when he's getting ready to throw all the feces. During this time frame, there was running water in his cell. He does not dispute that. If he was so badly burned by the pepper spray, he had running water then. Instead of throwing feces, he could have washed his face. He had running water. There was no reason. Again, we come back to the fact that you can look at all of this, but no matter what, there is defined any reliable inference of wantonness and the infliction of pain by the defendants necessary to state a negative claim. It's just not there. Because instead of getting his feces ready to throw, he could have washed his face. He had running water in his cell after the pepper spray was put in his cell. Instead, he got up in the top of the bunk trying to hide from everybody and getting his 13 to 18 bottles of feces ready. So if he was in that much pain, if it was that problematic for him, he should have washed it. Again, you take everything he said and you put it in a trial, and those facts presented do not support a reliable inference of wantonness and the infliction of pain by the defendants. The defendants merely were going in there to get him. They had to eventually go in there to actually the restraint team to get him, to take him and put him into the restraints. Additionally, that's when he started throwing the feces at them. When he finally did get down there, he would never open his mouth, not for them and not for the medical people who saw him immediately thereafter. It was that same day, it was right after that, right before that, that he had been sent for the disciplinary hearing because he had a partial paper clip in his mouth. Again, we already know that he could get himself out of full body restraints. The fact that he was a threat was in these officers' minds. It was reasonable. Let me rephrase that. I don't know what was in their minds. I know that it was reasonable for the officers to view him as a threat under these circumstances, and Judge Gergel found the same thing. My time is about one minute left if you have any further questions. Okay, thank you. I think we understand your position. Thank you. Let's hear from Mr. Zerbruggen. Your Honors, the line that's drawn is between the force that's necessary to restrain an inmate or force that's reasonable in the restraining of an inmate and force that's used simply as corporal punishment, simply in retaliation for something that the inmate had already done. And the question as to which is involved in each of these incidents is a question for the jury, is a question of credibility, whether these inmates' affidavits and Mr. Mann's contentions are to be believed or whether they're to not be believed. I'd like to just address one factual issue, the question of whether Mr. Mann contested that he had running water in his cell with which he might have been able to decontaminate on August 23rd. According to inmate Jeske's affidavit, located on page 620 of the Joint Appendix, inmate Jeske clearly states that before chemical munitions were used, when the altercation between Mr. Mann and the prison guards were first beginning, that inmate states that inmate Mann, he refused, and that the officers, they, referring to the officers, immediately turned his water supply off. So we would submit that there is a mere material issue of fact with regards to whether Mr. Mann had water in his cell with which he might have had the opportunity to decontaminate. But unless Your Honors have other questions, I will rest on what I've stated. Thank you very much. Thank you, Your Honors. I note that you're court-appointed and a student, and we appreciate very much your undertaking representation of this client. Mr. Goldblatt, I also want to tell you that we appreciate your assistance in that of Georgetown University Law Center in assisting us with the representation of clients who have no attorney, and we're always glad to see you, and your students always do a fine job, and we appreciate very much your help to us in that regard. I will come, unless, let me ask the clerk to adjourn court, then we'll come down and greet counsel. This honorable court stands adjourned until tomorrow morning at 9.30, Godspeed to the United States and this honorable court.
judges: William B. Traxler, Jr., Robert B. King, Andre M. Davis